Filed 11/30/15  P. v. Warren CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TYMARC D. WARREN,<br><br>Defendant and Appellant. | B253552<br><br>(Los Angeles County<br>Super. Ct. No. YA079985) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Steven R. Van Sicklen, Judge.  Affirmed with directions.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Tymarc Warren of first degree murder in violation of Penal Code section 187, subdivision (a). The jury found defendant personally used a deadly weapon, a knife, in the commission of the offense within the meaning of section 12022, subdivision (b)(1). The trial court sentenced defendant to 25 years to life for the murder and one year for the deadly weapon enhancement for a total sentence of 26 years to life.

Defendant appeals on the grounds that: (1) the jury was misled as to the nature of the heat of passion that can reduce first degree murder to second degree murder; (2) the jury was misled into believing that defendant's reaction could qualify as heat of passion only if a reasonable person would have killed in defendant's situation; (3) the jury was improperly given to understand that self-defense was not available to defendant if the jury believed he used more deadly force that was reasonably necessary; (4) the trial court failed to instruct sua sponte that imperfect self-defense applied if defendant had a good faith but mistaken belief that he was using no more force than necessary to defend against lethal force; (5) the trial court's nonstandard instruction on imperfect self-defense was incorrect in several respects; (6) the trial court failed to instruct sua sponte that an initial aggressor who uses nondeadly force and whose opponent responds with deadly force has a right to use deadly force to defend himself; (7) the record shows defense counsel provided inadequate assistance; (8) cumulative prejudicial errors require reversal; and (9) the abstract of judgment must be corrected to reflect defendant's correct number of credit days.

## FACTS

### Prosecution Evidence

Defendant and Eileen Garnreiter began dating in 2008 or 2009. They moved into an apartment together in June 2010. In December of that year, Garnreiter gave birth to their daughter, L. Defendant and Garnreiter began to have problems in their relationship after the birth, and Garnreiter was often upset. She would take the baby and stay at the home of her mother, Yesenia Nash. Garnreiter complained to Nash about defendant's verbal abuse. He cursed at her and criticized her weight, cooking, and

driving. Garnreiter also complained about defendant's gambling and his failure to look for employment.

On January 7, 2011, Garnreiter went to Nash's house with an overnight bag. After talking with Nash, Garnreiter agreed to move permanently to Nash's house with the baby. That night, defendant told his sister, Tataneasha McDaniel, that he was upset with Garnreiter because he was separated from his child when Garnreiter took her to Nash's house. Defendant was also upset by things he had read in Garnreiter's Facebook account. Defendant suspected that Garnreiter was open to seeing other men and planned to leave him and take the baby with her.

During a telephone conversation with McDaniel, defendant said he hated Garnreiter and wanted to punch her in the face. He said he had not felt hate like that in his heart since he "pulled out ammunition on [his] sergeant." He told McDaniel that he had seen that Garnreiter told a male through her Facebook account that she was no longer in a relationship and referred to herself as a single mother.

On the same night, defendant went to Nash's home, where he spoke with Nash, who would not let him in. Eventually, Garnreiter went outside and spoke with defendant. To Nash's surprise, Garnreiter began packing her things when she came in. She told Nash, "I better go home before things get worse tomorrow." Garnreiter drove off and returned to the apartment she shared with defendant.

At approximately 1:06 a.m. on January 8, 2011, defendant telephoned his sister and asked what he should do. He said that Garnreiter was dead, he had slit his wrist, and he wanted to know what to do with L. He asked McDaniel, "I want to know if I should take [L.] with us." Alarmed, McDaniel woke her father, Tymarc Warren, Sr. (Warren Sr.), and told him to go to defendant's apartment. Warren Sr. quickly drove to the apartment and forced his way inside. He saw defendant lying over Garnreiter on the floor. L. was on the counter. Warren Sr. called 911. Defendant said, "Dad, what have I done?" After Warren Sr. picked up the baby, defendant tried to poke himself in the chest with the knife and said, "I don't want to live."

3

When sheriff's deputies arrived, defendant said, "I killed her because I got hate in my heart. The devil put it there, and I started to choke her. That's why she grabbed the knife. But before she could use it, I forced it down her throat while she was still holding it." A bloody butcher knife was about a foot away from defendant. Deputy Andrew Dousenard asked defendant if the victim had cut his wrists. Defendant replied, "I have the devil and hate in my heart. I stabbed her, then I cut my wrist." Defendant was calm and spoke in a flat tone. He was transported to the hospital for treatment.

Dr. Lisa Scheinin was the Los Angeles County deputy medical examiner who performed an autopsy on Garnreiter. Scheinin stated that the manner of death was homicide and the cause of death was multiple stab wounds. Dr. Scheinin noted "quite a few injuries" on Garnreiter's body. She had a bruised left eye, a bruised nose, a bruised forehead, and multiple areas of hemorrhage in the left eye itself. Dr. Scheinin believed the eye injury was caused by a blow to the eye.

Garnreiter had multiple petechial hemorrhages on both cheeks, and on the forehead, chin, and bridge of the nose. The petechial hemorrhages were signs of strangulation. They were all over the skin of her face, the inner linings of the eyelids, on the sclera of the right eye, and on the inside of the upper lip. This diffuse distribution of petechia was typical of an external neck compression. There were also injuries to the interior muscles of the neck and exterior bruises on the neck.

There was a total of 16 stab wounds. There were three stab wounds in a small area of the neck. One was on the right side of the neck and severed the carotid artery and jugular vein. This stab wound also injured parts of the back of the throat above the larynx and went through portions of the back of the throat, which caused Garnreiter to aspirate blood into her lungs. A second stab wound had a depth of between four and five inches and an area of abrasion at its upper margin. Abrasion of any part of a stab wound is usually due to the hilt of the knife contacting the skin, i.e., the blade was plunged so deeply that it went as far as it could to the hilt. A third stab wound was located in front of the neck. It had a depth of approximately three to five inches. The orientation of the blade was different in that unlike the other two wounds, the squared end of the knife was

4

toward the front, and the sharp end was towards the back. The three stab wounds to the neck were individually fatal because they injured the blood vessels and the inner structures of the neck that allowed blood to enter the airway.

Garnreiter also had stab wounds on her chest and abdomen. One was below the nipple of the right breast. The stab wound to the chest was potentially fatal because it entered the chest and could have collapsed the lung. Another stab wound of eight to 10 inches was in the upper right abdomen and caused the complete perforation of the liver. The perforation of the liver was easily another fatal wound because a great deal of blood is supplied to the liver. A victim could die from the associated blood loss.

Garnreiter had several defensive wounds that she apparently suffered when attempting to ward off a blow, or she grabbed the knife. There were two poke wounds between the right breast wound and the stab wounds to the neck. Dr. Scheinin believed that the poke wounds were caused while Garnreiter was moving and trying to get away, and the knife did not make full contact with the skin. Slice marks on the fingers and on the palm of the hand were not consistent in any way with Garnreiter holding the knife and making a stabbing motion. An incised defensive wound on the inner right knee grazed the skin and curved around, which was consistent with a serrated blade. Dr. Scheinin believed the injury was consistent with the knife coming down in a slashing motion while Garnreiter flailed around and curled into a ball, or drew her knees up to her chest in trying to protect her chest.

The asphyxia by neck compression was a contributory factor to the cause of death because it could have had a temporary incapacitating effect on Garnreiter. The strangulation did not completely render Garnreiter unconscious because she had defensive injuries. Garnreiter's injuries were consistent with her standing in front of the perpetrator, being punched in the face, manually strangled, and then being placed in a "sleeper hold" with the perpetrator's forearm. She then could have been stabbed if she had the sleeper hold on the left side and stabbed back to front on the right side, which would be consistent with the wounds to the abdomen and breast. Either the knife was repositioned in the hand or the hand itself was repositioned with the knife.

5

**Defense Evidence**

Defendant testified that he was 28 years old. He had never known his biological mother while growing up. Warren Sr.'s wife, Yolanda, lived with defendant from the ages of five through age eight, and she abused him. When Warren Sr. went to prison, the abuse worsened. Yolanda was also abusive to McDaniel and defendant's younger sister K. Child Protective Services was contacted after Yolanda burned K.'s hands by placing them over the lit stove. Defendant and his sisters were taken from the home and never lived with Yolanda again.

Defendant testified that, despite the abuse, he did well in school. He was in the gifted and talented education program in junior high school. He played football in high school, was a member of the drama club, and had a lot of friends. He was never involved in a gang. He joined a fraternity that was geared toward scholastics.

When he was 17 years old, he enlisted in the Army. In 2003, he received basic training at Fort Benning in Georgia and went on to serve two six-month tours of duty in Iraq. He witnessed several traumatic events during his time in Iraq, and his battle buddy was injured when a mortar exploded near him. He saw people with missing limbs. He was made to watch a video of a beheading, and shortly thereafter he began thinking about suicide. He was suffering from sleep deprivation when he went into a dumpster, put a gun in his mouth, and pulled the trigger. His gun jammed. He was put on suicide watch for 72 hours. Once, he was approximately 100 meters from the explosion of an improvised explosive device (IED), and he later heard the screams of other soldiers, which affected him.

After he returned to civilian life, defendant felt anxiety when he went to nightclubs. Defendant later learned that he disliked and felt uneasy with the "disorganized" crowds and felt that he was "more on guard" all the time. He had recurring nightmares of a jet exploding inside an aviation hanger. He also felt anxious when he went to El Camino College. He did not like walking the hallways. A professor and his father advised him to go to Veterans Affairs (VA), where he was given a muscle relaxer prescription that helped him sleep. He was also given a mouth guard because he

6

was grinding his teeth at night in his sleep. Defendant took his medication, but his father confiscated it after defendant's second suicide attempt, in which he consumed a bottle of his medication. This attempt occurred after he was terminated from the Federal Aviation Administration in April 2009. The termination devastated defendant.

Defendant met Garnreiter in January 2008 and they were dating regularly by April 2008. They had a loving relationship. Defendant was very excited when he learned Garnreiter was pregnant in March 2010. Garnreiter worked two part-time jobs, and defendant got a job with the Census Bureau. Defendant gambled at a local casino, and in September 2010, he lost about $6,000 while gambling. When Garnreiter threatened to leave him, defendant began attending Gambler's Anonymous. Soon after their baby's birth in December 2010, while Garnreiter was still in the hospital, defendant began feeling "negative energy" from Garnreiter. When Garnreiter came home, defendant delayed starting a new job for about three weeks so he could stay home and take care of Garnreiter and the baby.

At one point, after defendant expressed his disapproval of Garnreiter's lack of care of her appearance, Garnreiter insisted on being taken to her mother's. She stayed at Nash's house for a couple of days. After that, Garnreiter began going out more frequently with friends while defendant stayed home with the baby. Defendant felt that he was being punished, but he was willing to do everything to get back on Garnreiter's good side. Garnreiter frequently felt depressed during this time and began drinking frequently.

There was tension between defendant and Nash over childrearing methods and providing health care for the baby. On January 6, 2011, Nash came to the apartment to discuss the health care issue. Defendant said he would inquire whether the VA could provide health care for the baby. Garnreiter said she was going to take the baby to Nash's house that night so he could get some rest. There were no problems between defendant and Garnreiter when she left their apartment on the night of January 6.

On the following morning, January 7, 2011, Garnreiter sent defendant a text message saying, "Good morning. I hope you're on your way, and I love you."

7

Defendant responded that he loved her, too. Defendant found out that his daughter did not qualify for health care with the agency. Defendant telephoned Garnreiter and told her, and she said he needed to do something. When Garnreiter came home they argued. Garnreiter announced she was going to her mother's house and left the apartment.

That evening, defendant began getting phone calls from concerned family members. They told him that Garnreiter had indicated on her Facebook account that she was tired of him. She was leaving him and taking the baby. Defendant was surprised. When he called Garnreiter, she did not answer her phone. Defendant was able to log into Garnreiter's Facebook account, where he read a conversation between Garnreiter and a man about meeting, which showed her interest in other men and confirmed that she wanted to leave defendant. Defendant felt betrayed.

Defendant and Garnreiter engaged in a lengthy series of text messages. She did not want to be with him any longer. Defendant replied, "If you want to leave, that's fine, but our agreement was for me to spend the day with [the baby]. So I'm going to go over there and get [the baby]." Defendant was not too upset that Garnreiter was moving on. His main focus became his daughter. Defendant called McDaniel to find out if he was in the right in going to get his child. McDaniel said Garnreiter was harboring their child and told defendant that he could get the baby.

Defendant went to Nash's house. Nash told him that Garnreiter was feeding the baby and closed the door. Defendant started walking back to his car, but returned to the door and rang the doorbell again. Defendant said he just wanted the baby. Defendant asked to enter and speak with Garnreiter. Nash replied, "She'll come talk to you if she feels like coming to talk to you." Defendant replied, "You know what, I'm calling the police, Ms. Yesse," and walked away. The police merely told him to file for custody. As defendant began to drive away, Garnreiter came out. Defendant and Garnreiter argued over her mother's interference, her desire to leave, and the lack of health care for the baby. Garnreiter said she was going to their apartment to pack her things on Monday.

Defendant testified he was in "pretty bad shape" and felt his world was crumbling again and he needed support. While driving to his apartment, he spoke to his younger

8

sister and said he was not sure whether life was worth fighting for. Defendant also spoke with McDaniel when he arrived home. Defendant asked what the point of life was, and stated that Garnreiter and the baby were all he had, and that Garnreiter wanted to pack her things when he went to work on Monday.

Defendant again looked at Garnreiter's Facebook account and saw a message in which Garnreiter called McDaniel a whore. Defendant told McDaniel and she became upset. McDaniel said, "Ooh, I feel like beating her up." Defendant agreed, stating, "Me too. I want to punch her in the face. I feel like punching her in the face."[1] McDaniel told defendant to come to her house because she did not think he should be by himself. At that point, Garnreiter walked into the apartment. Defendant was surprised because she had said she would not return until Monday. When defendant asked Garnreiter why she had returned the apartment, she stated that she needed to get some things.

Defendant and Garnreiter talked in the living room. Defendant told Garnreiter they could work it out and she should spend the night with him. Garnreiter agreed. Defendant and Garnreiter then argued about the insult to McDaniel posted on Facebook. Garnreiter told defendant he had no right to go onto her Facebook account. They continued to argue, and defendant told Garnreiter to give him the baby. He said he would feed her while she was packing her bags, as she wanted to do. When defendant then grabbed the baby from Garnreiter, she said she was not going anywhere, but he had to go. They continued arguing. When defendant made a disparaging remark about Nash, Garnreiter pushed him. Defendant placed the baby on the counter and grabbed Garnreiter around the neck from behind her. He put his right arm across her throat.[2]

Defendant said, "What if I had dropped [L.]. You need to calm down." Garnreiter kept telling him to let go of her. He repeated that she need to calm down, and "she just

---

[1]      In her statement to police, McDaniel did not mention that it was she who first talked about punching Garnreiter and that defendant merely agreed with her.

[2]      At the time of the murder, defendant was five feet, 10 inches tall and about 170 pounds; Garnreiter was about five feet, four inches tall and weighed about 180 pounds.

9

starts fighting me." Defendant testified, "She rams me against the stove, and we're just turning. And she grabs my balls so I start squeezing her tighter. And then she has a knife. I don't even remember when she grabbed the knife."

Defendant grabbed her wrist with his left hand and told her to put down the knife. She kept telling him to let go of her. She was slipping down and out of his right arm, so he grabbed her on the throat with his right hand. He kept yelling to put the knife down and she yelled for him to stop and let go. "She kept pushing down and I kept pushing inward. I just got so mad. . . . I didn't know what to do. I couldn't let her go. No way. . . . I was too afraid. So I just started focusing on more on working the knife towards her. And at some point I just lost it, and I . . . turned her wrist." Defendant testified, "I pushed it in. She let go of it, and I grabbed it." He said he grabbed the knife with his right hand. Garnreiter fell and was still trying to grab the knife. Defendant thought that might have been when he hit her, so that she would let go.

Defendant told Garnreiter to "hold on," and he began looking for his cell phone. He was running all over the house. The baby cried, and he thought she was injured because she had blood on her. Defendant grabbed the baby, ran to the bathroom, and removed her clothes. He saw there was no blood under them, and she was not injured. He crawled in the bathtub with her and said he was sorry. He did not mean to hurt mommy. He started cutting his wrist. He got out of the bathtub and looked at Garnreiter. He started cutting his wrist more. He wanted to stick the knife in his neck but was worried about who would get L.

Defendant found Garnreiter's phone and called his sister. He told her that Garnreiter was dead, he had cut his wrist, and L. could not come with them so she needed to come and get her. He felt lightheaded. The next thing he remembered was his dad standing there, and he told his dad to grab the baby. When he saw the baby was safe he tried to stab himself in the heart.

The next thing he remembered was getting fingerprinted. He did not recall making the statements attributed to him by the responding deputies. He did not recall

10

making any statements to Detective Dameron Peyton. Defendant did not tell McDaniel that Garnreiter had attacked him.

On cross-examination, defendant said he took complete control of the knife in his right hand after the first stab wound. When asked what he did with the knife, he said he "hit her twice" in the neck. At that point, Garnreiter fell on her left side. She pulled defendant down with her. She grabbed hold of the sharp portion of the knife. He told her to stop. That is when defendant hit her. He pulled the knife away from her and stood over her. When asked how the next 12 stab wounds occurred, defendant replied he recalled only the three to the neck. He did not remember every instant of the altercation. He did not recall saying on direct examination that he did not remember anything after forcing the knife into her throat one time. As the prosecutor ran through the stab wounds, defendant testified he did not know or did not recall how he inflicted them.

Defendant said he had taught Garnreiter a little about hand-to-hand combat. If used properly, some of the things he taught her could be threatening. Up until the stabbings, she was never a threat to him. He grabbed her because she pushed him while he had the baby. He took a moment and set the baby down. He stated this was a calm decision. He then grabbed Garnreiter to calm her and tell her not to push him while he had the baby again. At the time of the killing, defendant was aware that stabbing a woman even once on the throat would be dangerous to human life.

Defendant testified that when he had full control of the knife with both of his hands and had Garnreiter in a chokehold, he believed he was in danger of death or bodily injury. He did not believe she was stabbed 16 times. When asked, "In all of these stab wounds that you inflicted do you think it was excessive, he answered, "Yes, sir." He also testified that when he had full control of the knife, stabbing Garnreiter was necessary and reasonable.

Defendant acknowledged that he had never fired a machine gun in Iraq. He never had to engage or fight the enemy. The IED explosion he talked about occurred approximately 150 meters away from him, and no one was injured. In the five years after he left Iraq, he had no other violent incidents.

11

Psychologist Michael Perrotti testified on behalf of the defense. He specialized in neuropsychology. He had treated servicemen who had brain trauma and suffered from depression and posttraumatic stress disorder (PTSD). He conducted three forensic assessments of defendant and collateral interviews with Warren Sr. and McDaniel. He found that defendant had a long history of emotional breakdown under stress. He noted that the stress of an event in the military that caused exhaustion and sleep deprivation resulted in defendant's suicide attempt. He found defendant had significant neuropsychological deficits in brain processing speed. Defendant also had a deficit in the executive functioning area of the brain, which controls reasoning, planning, and logic. It relates to impulse control and the ability to organize one's behavior.

Dr. Perrotti found defendant also suffered from Complex PTSD. He had suffered physical abuse as a child, and later in life experienced the trauma of things that happened to him in battle when he was serving in Iraq. He also had suffered a concussion during high school football. Dr. Perrotti categorized defendant's condition as Complex PTSD because of these multiple instances of trauma, and the findings of defendant's evaluation were consistent with the symptomatology of Complex PTSD. The doctor also believed defendant suffered from dissociative identity disorder, which was manifested by hearing a voice that was not his and thinking that his thoughts were not his. Defendant also "had a major depression."

Defendant was exposed to an explosive blast, and it was difficult to say what the impact was on him. It was probable there was some sort of shock wave exposure from that. He also was exposed to a video of a beheading and a woman who lost her arms. He had nightmares of explosions and dead bodies. The person in the beheading became himself. Defendant broke down and cried uncontrollably during his interview with Dr. Perrotti.

Dr. Perrotti believed that defendant was in a survival mode from the military. When he was in an altercation with the victim, he was in an instinctive mode of "it's either me or them." Based on his interview with Warren Sr., Dr. Perrotti believed defendant had an impaired state of consciousness at the time of "the allegations."

12

Because of his Complex PTSD, defendant was highly prone to overreact, and combined with his military training "and survival at all costs," it "impacted his behavior during the allegations." Dr. Perrotti testified that certain triggers may cause a person with military combat training and PTSD to react violently. Dr. Perrotti believed that the report of Dr. Collins, the prosecution expert, showed defendant was highly likely to decompensate under stress to a primitive level of functioning.

PTSD is a mental disorder listed in the most recent edition of the Diagnostic and Statistical Manual of American Psychiatric Association (DSM-5). Dr. Perrotti acknowledged that Complex PTSD was not in the DSM-5.

**Rebuttal Evidence**

Detective Peyton and his partner, Detective Margarita Barron, spoke with defendant in the hospital during the early morning hours after the stabbing. Defendant was advised of his constitutional rights, and he appeared lucid. When asked how the killing occurred, defendant said that he and Garnreiter were arguing over some content on Facebook. Defendant tried to take the crying baby from Garnreiter so that he could feed her. Garnreiter took the bottle from him and walked away. At that point, he snatched the child from her. Garnreiter shoved him, and he placed the baby on the counter and grabbed Garnreiter by the neck. She struggled and at some point grabbed a knife. She told him to stop and let her go. He grabbed the knife and they struggled. When she attempted to stab him, and did stab him, he grabbed the knife and forced it down her throat. He then took control of the knife, switched it from his left hand to his right, and he continued to stab her. She fell and he stabbed her again in the throat and continued to stab her. When asked if he thought about calling police or paramedics, defendant said he thought about it, but when he saw that Garnreiter was not breathing and motionless, he began stabbing himself.

Detective Peyton asked defendant about his service in the military. Defendant told him about an incident related to sleep deprivation. He had just come off a convoy shift after working two shifts in a row. He was instructed to work a third shift. When defendant complained to his sergeant that he was tired, he was told to continue and do

13

what he had to do. Defendant said he was mad and so upset that he wanted to kill his sergeant, but decided to kill himself instead. Defendant chambered a round and tried to fire but the gun malfunctioned.

Psychiatrist Peter Collins evaluated defendant to determine whether he suffered from PTSD. He testified that Complex PTSD was not in the diagnostic criteria. There are many debates about what it is, and he did not know what it was. Dr. Collins described the symptoms of PTSD and concluded that defendant did not meet the criteria for a PTSD diagnosis. Dr. Collins believed that although defendant was exposed to certain events in Iraq, those events were fairly normal over there and, by his own account, defendant stated that they did not affect him. Dr. Collins examined defendant in connection with the four or five incidents that Dr. Perrotti felt met the criteria of PTSD and found they did not. Although the events caused defendant to experience some disturbing nightmares, they did not meet the criteria for PTSD. When defendant came back to the United States, he did not meet the diagnosis and did not complain about psychological difficulties with his deployment. He told Dr. Collins that if he had not injured his knee he would have remained in the military. Dr. Collins's general impression was that serving his country and his time in Iraq was probably one of the more positive events in defendant's life.

Defendant talked to Dr. Collins about insomnia in relationship to two areas. He was getting up regularly to take care of his baby, and he was having difficulties in the correctional center because of the noise. Sometimes he would ruminate on the events that led to his trial. His insomnia in the military was not sustained. At one point, he was taking a muscle relaxant for his temporomandibular joint. Given the circumstances defendant described about the IED blast, Dr. Collins stated that defendant suffered no blast injury in Iraq.

# DISCUSSION

## I. Instructions on Heat of Passion in Relation to Second Degree Murder

### A. Defendant's Argument

Defendant contends it was reasonably likely that the jury erroneously understood from the jury instructions, combined with the prosecutor's argument, that the provocation necessary to reduce first degree murder to second degree murder under the heat of passion theory contained an objective, reasonable person requirement.

### B. Relevant Authority

"The test of whether provocation or heat of passion can negate malice so as to mitigate murder to voluntary manslaughter is objective.  [Citations.]  '[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless . . . the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable [person].'  [Citation.]  The test of whether provocation or heat of passion can negate deliberation and premeditation so as to reduce first degree murder to second degree murder, on the other hand, is subjective. [Citations.]" (*People v. Padilla* (2002) 103 Cal.App.4th 675, 678.)

When instructions are claimed to be conflicting or ambiguous, "we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights." (*People v. Rogers* (2006) 39 Cal.4th 826, 873.)  We look to the instructions as a whole, rather than one or two phrases plucked out of context, and to the entire record of trial, including the arguments of counsel.  (*People v. Stone* (2008) 160 Cal.App.4th 323, 331; *People v. Dieguez* (2001) 89 Cal.App.4th 266, 276.)

### C. Proceedings Below

The trial court instructed the jury with CALCRIM No. 520 on the proof required to find defendant guilty of first or second degree murder with malice aforethought.  The instruction defined express malice and implied malice.  The instruction told the jury that, if it decided defendant committed murder, the murder was of the second degree unless the People proved beyond a reasonable doubt that it was murder of the first degree as defined in CALCRIM No. 521.

15

CALCRIM No. 521 explained that first degree murder required the People to prove defendant acted "willfully, deliberately, and with premeditation," and the instruction defined each of these terms. This instruction told the jury that "[a] decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated."

CALCRIM No. 522 explained that provocation could reduce a murder from first degree murder to second degree murder, and it could reduce a murder to manslaughter. The instruction told the jurors that they should consider any provocation to defendant when deciding whether the crime was first degree murder or second degree murder, and whether he committed murder or manslaughter.[3]

CALCRIM No. 570 explained heat of passion in relation to voluntary manslaughter. The instruction states that a killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or heat of passion, which occurred if the defendant was provoked. As a result, he acted rashly and under the influence of intense emotion that obscured his reasoning, and the provocation would have caused a person of average disposition to act without deliberation, i.e., from passion rather than judgment.[4]

---

[3]     The trial court read CALCRIM No. 522 in its entirety as follows: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. If you conclude the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

[4]     The trial court read CALCRIM No. 570 in its entirety as follows: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. The defendant killed someone because of a sudden quarrel or in the heat of passion if: One, the defendant was provoked; two, as a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and, three, the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. Heat of passion does

16

## D. Analysis

Defendant claims there is a reasonable likelihood the jury misunderstood the governing law and believed that both the provocation required to reduce first degree murder to second degree and the provocation required to reduce murder to manslaughter required the jury to determine whether an average and reasonable person would have reacted from emotion. He posits that when the instructions are considered in conjunction with the arguments of the prosecutor and viewed from a common sense perspective, the likelihood that the jury held the inaccurate view was inevitable. Although the word "provocation" was defined as containing an objective, reasonable person element in the instruction on voluntary manslaughter, nothing informed the jury that "provocation" had a different meaning with respect to second degree murder. CALCRIM No. 522 reinforced giving the word the same meaning, since it was the only instruction to mention provocation in connection with second degree murder, and it described "provocation" in identical terms as to both second degree murder and manslaughter.

This "natural reading," defendant argues, was "set in stone" when the prosecutor stated without qualification that defendant "'loses as to [his] claim' of heat of passion because under 'the letter of the law,' provocation had to satisfy the objective, 'average person' test." Defendant argues that the following portions of the prosecutor's argument

---

not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation, as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment. The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

17

misled the jury: The prosecutor stated, "you need to make sure you're following the law. You need to make sure you look at your jury instructions and make sure you're going right down the letter of the law." He explained that the letter of the law was as follows: "For heat of passion you have to find that the defendant was provoked; that the provocation caused a rash act due to intense emotion that obscured judgment. This is the big one, folks. This is the big one. That that provocation was such that it would cause an average person—your average, reasonable person to act rashly without due deliberation. Meaning to say, that whatever [Garnreiter] did was so provocative that an average, reasonable person would have reacted and started plunging the knife into her throat or putting her in a stranglehold. And that's where Mr. Warren loses as to this claim."

Defendant also cites the following portion of the prosecutor's argument: "Folks, no reasonable, average person would react in this way. This was not the decision of a reasonable, average person. . . . You can't say was this an average reasonable person with some sort of mental disorder. You can't do that. Okay? It has to be just your average, reasonable person. Okay?"

And in rebuttal, the prosecutor argued, "Okay. So [Garnreiter] pushes him. [Garnreiter] pushes him. And what the defense wants you to find is that that is reasonable provocation for [Garnreiter's] death. Folks, average, reasonable person standard, not taking into account any claim of any mental health issues."

The record shows that the trial court gave the instructions on murder and manslaughter without objection. Defendant did not request a pinpoint instruction on the difference in the provocation required to reduce first degree murder to second degree murder. (See *People v. Jones* (2014) 223 Cal.App.4th 995, 1001 (*Jones*) [CALCRIM Nos. 520, 521, 522, and 570 correctly state the law, and absent a request for a pinpoint instruction regarding the standard of provocation required to reduce first to second degree murder, the trial court had no duty to make such a modification to the pattern instructions, and failure to request such a pinpoint instruction forfeits the claim on appeal].) There were no objections to the prosecutor's argument, and defendant has therefore forfeited these issues on appeal. (*Jones*, at p. 1001.)

18

Even if defendant's issues were not forfeited, we would reject them. As noted, in *Jones* the same instructions given in defendant's case were found to be correct and not misleading. (*Jones*, *supra*, 223 Cal.App.4th at pp. 999, 1001; see also *People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1334.) In *Hernandez*, for example, the court stated, "Although CALCRIM No. 522 does not expressly state provocation is relevant to the issues of premeditation and deliberation, when the instructions are read as a whole there is no reasonable likelihood the jury did not understand this concept. Based on CALCRIM No. 521, the jury was instructed that unless defendant acted with premeditation and deliberation, he is guilty of second, not first, degree murder, and that a rash, impulsive decision to kill is not deliberate and premeditated. Based on CALCRIM No. 522, the jury was instructed that provocation may reduce the murder to second degree murder. [¶] In this context, provocation was not used in a technical sense peculiar to the law, and we assume the jurors were aware of the common meaning of the term. [Citation.] Provocation means 'something that provokes, arouses, or stimulates'; provoke means 'to arouse to a feeling or action[;] . . . to incite to anger.' [Citations.] Considering CALCRIM Nos. 521 and 522 together, the jurors would have understood that provocation (the arousal of emotions) can give rise to a rash, impulsive decision, and this in turn shows no premeditation and deliberation." (*Id*. at p. 1334.) *Hernandez* points out that CALCRIM No. 521 connects "a rash, impulsive decision to kill" to murder that is not premeditated and/or deliberated. (*Hernandez*, at p. 1334.)

With respect to the prosecutor's argument, the record shows that defense counsel, in her closing argument, argued exclusively for a verdict of voluntary manslaughter. She discussed sudden quarrel and heat of passion and also provocation. She defined the provocation by Garnreiter as the act of squeezing defendant's testicles. Her principal argument was that of imperfect self-defense, however. She argued that defendant was suffering from the effects of PTSD and had disassociated himself from what was occurring. She pointed out that the jury was instructed in CALCRIM No. 3428 that a mental disorder could be considered when deciding whether defendant acted with the intent or mental state required for a particular crime. Defense counsel never argued that

19

the jury should find defendant guilty of second degree murder, as opposed to first degree, based on his subjective perception of provocation.

The prosecutor was able to anticipate the defense strategy, since in opening argument defense counsel discussed PTSD at length, and stated several times that defendant's crime was manslaughter and not murder. It appears the prosecutor sought to preempt this rationale by the arguments quoted *ante*. In light of the defense arguments, the prosecution's argument strategy could not have reasonably misled the jury in its consideration of the evidence of provocation in determining whether defendant premeditated and deliberated the killing so as to distinguish between first and second degree murder. As instructed, the jury had to decide first if defendant was guilty of manslaughter or murder. After deciding whether defendant committed murder, the jury then had to consider whether the evidence showed deliberation and premeditation. Nothing in the prosecutor's argument, or the instruction, misled the jury into failing to consider whether any provocation by Garnreiter obviated this mental state.

Defendant also contends that, to the extent his argument was forfeited, his counsel was deficient for failing to object. Since we have addressed defendant's argument, we do not need to discuss this alternative argument.

Furthermore, even if the instructions on provocation were confusing or misleading, defendant suffered no conceivable prejudice under any standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]; *People v. Watson* (1956) 46 Cal.2d 818, 836-837 (*Watson*) [reasonable probability of different verdict].) The jury was told, "If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (CALCRIM No. 200.) The jury was instructed to consider the instructions together. (CALCRIM No. 200.)

Moreover, there was overwhelming evidence of premeditation and deliberation. Defendant punched Garnreiter in the eye, held her in a chokehold, and manually strangled her before any stabbing took place. Defendant thus had overpowered Garnreiter and could have stopped his assault at any time. During the time defendant forced Garnreiter's hand holding the knife up to Garnreiter's throat, if indeed this is what

20

occurred, defendant had time to reflect on his actions. Defendant forcefully stabbed Garnreiter five times in the neck, chest, and abdomen. Garnreiter's stab wounds in the neck were up to five inches in depth. He also poked her between the breast and neck and slashed her 11 times on her arms, hand, fingers, and knee. The jury could reasonably have inferred from the evidence that defendant's manner of killing Garnreiter, if nothing else, demonstrated a deliberate plan to kill her. (See, e.g, *People v. San Nicolas* (2004) 34 Cal.4th 614, 658 [the number of wounds on the victim's body, many of which were fatal, led to reasonable inference defendant intended to kill the victim].) The fact the multiple wounds were clustered in areas containing vital organs tends to suggest a preconceived design to kill, rather than a sudden explosion of violence. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1253; *People v. Elliot* (2005) 37 Cal.4th 453, 471 [three potentially lethal knife wounds, repeated throat slashing and numerous other stab wounds could be construed as suggesting a premeditated design to kill].) Premeditation requires no more than a successive thought, and even if the manner of killing is suggestive of rage, an inference of premeditation is not precluded. (*San Nicolas*, at p. 658.)

In addition, defendant told responding deputies that he killed Garnreiter because he had hate in his heart. He said he started to choke her, she grabbed the knife, but he forced the knife down her throat before she could use it. He took the time to move the knife from his left hand to his right hand to continue stabbing Garnreiter with his dominant hand.

We conclude the jury reasonably inferred from the evidence at trial that defendant's killing of Garnreiter displayed premeditation and deliberation, and any error caused by a lack of further instruction in second degree murder or the prosecutor's emphasis on manslaughter in his argument was harmless.

## II. Instruction on Heat of Passion and the Act of Killing

### A. Defendant's Argument

Defendant contends the instructions and the prosecutor's arguments led the jury to believe that the provocation defendant experienced had to be of a kind to cause an ordinary person of average disposition to *kill*, whereas it need merely be of a kind to

21

cause an ordinary person to react from emotion and without deliberation or judgment—not necessarily by killing. Defendant argues that the error requires reversal, since had the jury properly understood provocation, it could well have rendered a verdict of voluntary manslaughter. He asserts the circumstances mitigated culpability for the killing even if they did not justify homicide.

## B. Relevant Authority

"Provocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' ([*People v.*] *Logan* [(1917)] 175 Cal. [45,] 49 .)" (*People v. Beltran* (2013) 56 Cal.4th 935, 957.) This is the type of provocation that suffices to constitute heat of passion and reduce a murder to manslaughter and is known as the *Logan* standard. (*Id*. at pp. 938-939, 948-949.) The provocation is not required to be of a kind that would cause an ordinary person of average disposition to kill. (*Beltran*, at p. 938.) The proper focus is on the defendant's state of mind, not on his particular act. (*Id*. at p. 949.)

## C. Proceedings Below

As noted, the trial court instructed the jury on voluntary manslaughter with CALCIM No. 570, which told the jury that the defendant killed someone because of a sudden quarrel or in the heat of passion if the defendant was provoked and, as a result of the provocation, he acted rashly and under the influence of intense emotion that obscured his reasoning or judgment, and the provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion instead of judgment.

In arguing a lack of provocation to the jury, the prosecutor stated that the jury had to find, "that whatever [Garnreiter] did was so provocative that an average, reasonable person would have reacted and start plunging the knife into her throat or putting her in a stranglehold." In rebuttal argument, the prosecutor stated, "[Defense counsel] referenced provocation. And remember, if you find provocation, what does it have to be? It has to

be such that a reasonable, average person would feel provoked to commit that act." The jury did not have any questions during deliberations.

### D. Analysis

Defendant argues that *Beltran* controls this issue on appeal. In that case, the defendant was charged with the murder of his former girlfriend. (*Beltran*, *supra*, 56 Cal.4th at pp. 939, 941.) The trial court modified the standard instruction explaining voluntary manslaughter based on heat of passion (CALCRIM No. 570) with the agreement of the parties. (*Beltran*, at p. 943.) The modified instruction stated in pertinent part: "*In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.*" (*Id.* at p. 944.) During deliberations, the jury asked if the phrase ""how such a person would react in the same situation knowing the same facts"" meant ""to commit the same crime (homicide) or can it be other, less severe, rash acts[?]"" (*Id.* at p. 945.) After consulting counsel, the trial court provided the following response: "'The provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly and under the influence of such intense emotion that his judgment or reasoning process was obscured. This is an objective test and not a subjective test.'" (*Ibid.*, fn. omitted.)

During closing argument in *Beltran*, the prosecutor stated that the provocation had "'to be such that a person of average disposition [would] act with passion rather than judgment . . . . You don't go out and kill somebody.'" (*Beltran*, *supra*, 56 Cal.4th at p. 943, fn. 5.) Defense counsel argued that the prosecutor had misstated the law, and that "'[i]f the provocation causes a person to act rashly and without thinking, that's what this provocation is under the law. It doesn't say the provocation would have caused a person of average disposition to kill.'" (*Id.* at p. 943, fn. 4.)

The *Beltran* jury convicted the defendant of second degree murder. (*Beltran*, *supra*, 56 Cal.4th at p. 941.) On appeal, the defendant argued that the instruction given was misleading in that telling jurors to consider how a person would react in the face of

the provocation led the jurors to question whether an average person would react physically and kill as opposed to reacting mentally by undergoing obscured reason, thus precluding the formation of malice. (*Id*. at p. 945.)

A divided panel of the Court of Appeal reversed the conviction. The majority concluded that the parties' arguments created an ambiguity in the trial court's jury instruction on provocation, and it was prejudicial to the defendant. (*Beltran*, *supra*, 56 Cal.4th at pp. 945, 955.) Also, the trial court's response did not clarify the ambiguity in the instruction, and the prosecutor's argument reinforced the problem caused by the jury instruction. (*Id*. at p. 955.)

The California Supreme Court stated that the Court of Appeal's analysis fell short. (*Beltran*, *supra*, 56 Cal.4th at p. 955.) The court reaffirmed that the *Watson* standard applied, and that the prejudice analysis of the Court of Appeal overlooked the fact that the jury asked for additional guidance and the trial court gave it. (*Beltran*, *supra*, 56 Cal.4th at pp. 955-956.) "The trial court responded with a correct statement of law, that '[t]he provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly and under the influence of such intense emotion *that his judgment or reasoning process was obscured*.'" (*Id*. at p. 956.) The *Beltran* court also stated that "[t]his instruction properly focused upon the *rashness* of the act, not on the act alone." (*Id*. at p. 957.)

The *Beltran* court reversed the Court of Appeal. In its conclusion, the court reaffirmed the "venerable" *Logan* standard for determining heat of passion, i.e., that "[p]rovocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' [Citation.]" (*Beltran*, *supra*, 56 Cal.4th at p. 957.)

Defendant complains that his attorney did less to correct the prosecutor's incorrect statement of law than Beltran's attorney. In addition, the prosecutor's argument in his case was just as likely to have confused the jury, but there was no clarifying instruction from the court.

24

Although we agree with defendant that the prosecutor made an erroneous argument with respect to the provocation needed to reduce murder to manslaughter, like the court in *Beltran*, we find no prejudice. (*Beltran*, *supra*, 56 Cal.4th at pp. 955-957.) Defendant fails to show that the prosecutor's misstatement regarding provocation caused any jury confusion. Unlike in *Beltran*, where the jury's note indicated possible jury confusion, nothing in the record here indicates that the jury was confused or misled.

Moreover, prior to his remarks about stabbing Garnreiter, the prosecutor stated the correct standard: that the provocation from Garnreiter "was such that it would cause an average person—your average, reasonable person to act rashly without due deliberation." Defense counsel also stated the correct standard when she said that the provocation of Garnreiter squeezing defendant's testicles "could make someone act rashly and have their reasoning obscured." She read the entire CALCRIM No. 570 to the jury and explained each element as it applied to defendant's confrontation with Garnreiter. Defense counsel argued against the prosecutor's claim that defendant could not have acted in the heat of passion because he had time to cool off when he put the baby on the counter. Defense counsel stated that this occurred before Garnreiter had defendant's testicles in her grasp and up to that point he was calm and wanted to calm her down.

In addition, the trial court correctly instructed the jury in part under CALCRIM No. 570 that "[t]he defendant killed someone because of a sudden quarrel or in the heat of passion if: [¶] . . . [¶] [t]he provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." The court also instructed the jury under CALCRIM No. 200 that, if they believed the attorneys' comments on the law conflicted with the court's instructions, they were required to follow the court's instructions. Absent a showing to the contrary, we assume the jury understood and followed the instructions given. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) "[A]rguments of counsel 'generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive

and binding statements of the law.'" (*People v. Mendoza* (2007) 42 Cal.4th 686, 703, citing *Boyde v. California* (1990) 494 U.S. 370, 384; *People v. Osband* (1996) 13 Cal.4th 622, 717.) Prosecutorial misrepresentations should not be judged as having the same weight as instructions from the trial court. (*Boyde*, at pp. 384-385.) Where, as here, the jury was carefully instructed on the elements of provocation, the burden of proof and what constitutes evidence, we find no reversible error.

Furthermore, "the *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' [Citations.]" (*Beltran*, *supra*, 56 Cal.4th at p. 956.) Here, the evidence of provocation was weak, and as explained *ante*, the record discloses considerable evidence that Garnreiter's murder was premeditated and deliberate. As noted, there were several contradictions in defendant's testimony that called into question his credibility, such as the number of wounds he recalled inflicting. Some of the wounds appeared to be very intentional, purposeful and extremely violent. The jury concluded defendant acted willfully, deliberately, and with premeditation. Defendant "must carry his burden of proving prejudice as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel." (*People v. Williams* (1988) 44 Cal.3d 883, 937.) Defendant fails to make such a showing. The jury necessarily rejected any theory that defendant acted in the heat of passion.

Accordingly, there is no reasonable probability of a more favorable outcome for defendant had the jury been admonished again that the "proper focus" of an inquiry into provocation is "on the defendant's state of mind, not on his particular act" (*Beltran*, *supra*, 56 Cal.4th at p. 949).

## III. Instruction Regarding Use of Deadly Force

### A. Defendant's Argument

Defendant argues that CALCRIM No. 505[5] improperly told the jury that a person who is in imminent mortal danger and who is lawfully entitled to use deadly force to defend himself must use only objectively reasonable deadly force to protect his life. As a result, defendant's jury was authorized to reject self-defense and to convict him of murder under circumstances in which he was in fact entitled to an acquittal under the doctrine of self-defense. The error violated not only state law but also defendant's Fifth, Sixth, and Fourteenth Amendment rights to due process, equal protection, and a fair jury trial, requiring reversal.

---

[5] CALCRIM No. 505 on Justifiable Homicide (reasonable self-defense) was read to the jury as follows: "The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if: One, The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; Two, The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; and *Three, The defendant used no more force than was reasonably necessary to defend against that danger.* Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. *The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.* When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed. The defendant's belief that he was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true. Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter." (Italics added.)

27

### B. Relevant Authority

When instructions are claimed to be conflicting or ambiguous, "we inquire whether the jury was 'reasonably likely' to have construed them in a manner that violates the defendant's rights." (*People v. Rogers*, *supra*, 39 Cal.4th at p. 873.) We look to the instructions as a whole, rather than one or two phrases plucked out of context, and to the entire record of trial, including the arguments of counsel. (*People v. Stone*, *supra*, 160 Cal.App.4th at p. 331; *People v. Dieguez*, *supra*, 89 Cal.App.4th at p. 276.) We assume that the jurors are intelligent persons capable of understanding and correlating all of the instructions given. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1089.) If reasonably possible, we will interpret the instructions in support of the judgment rather than to defeat it. (*Id*. at p. 1088.)

Generally, a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012; *Ramos*, *supra*, 163 Cal.App.4th at p. 1087.) The rule of forfeiture does not apply, however, if the instruction was an incorrect statement of the law (*Hudson*, at p. 1012), or if the instructional error affected the defendant's substantial rights. (Pen. Code, § 1259; *Ramos*, at p. 1087.)

### C. Analysis

Because defendant contends both that the instruction was an incorrect statement of the law and that any error affected his substantial rights, we assume defendant's claim of error was not forfeited and address the merits. (*Ramos*, *supra*, 163 Cal.App.4th at p. 1087; but see *People v. Viray* (2005) 134 Cal.App.4th 1186, 1208-1209 [finding forfeiture despite defendant's claim that error affected his substantial rights].)

According to defendant, CALCRIM No. 505's third element is wrong under the law. This is the element that states the jury must find that, "[t]he defendant used no more force than was reasonably necessary to defend against that danger." We disagree with defendant.

Defendant cites no authority for the proposition that CALCRIM No. 505 is an inaccurate statement of the law. To the contrary, the third element of the instruction has

28

long been upheld as a legitimate element of justifiable self-defense. (See *People v. Whitfield* (1968) 259 Cal.App.2d 605, 609 ["Any force which is excessive, i.e., unreasonable under the circumstances, is not justified and the extent to which one may make resistance against an aggressor is a fact to be determined by a jury."]; *People v. Moody* (1943) 62 Cal.App.2d 18, 23 ["When attacked one has a right to stand his ground and defend himself and he may pursue his adversary if such pursuit is necessary to a successful defense; but the extent to which one may make resistance against an aggressor is a fact which must be determined by the jury by keeping in mind the amount or extent of force which a reasonable person would employ under similar circumstances."].)

Defendant cites a quotation in *People v. Humphrey* (1996) 13 Cal.4th 1073 (*Humphrey*), for the principle that "'[d]etached reflection cannot be demanded in the presence of an uplifted knife.'" (*Id.* at p. 1094, quoting *Brown v. United States* (1921) 256 U.S. 335, 343.) In *Humphrey*, the defendant was charged with murder and convicted of voluntary manslaughter. (*Humphrey*, at pp. 1080-1081). The court stated, "Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' [Citation.]" (*Id.* at pp. 1082-1083.) *Humphrey* continued, "To do this, it must consider all the ""facts and circumstances . . . in determining whether the defendant acted in a manner in which *a reasonable man* would act in protecting his own life or bodily safety."'" [Citation.] As we stated long ago, '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .' [Citation.]" (*Humphrey*, *supra*, 13 Cal.4th at p. 1083.) CALCRIM No. 505 does not prevent a jury from properly undertaking this task. *Humphrey* also quotes *People v. Clark* (1982) 130 Cal.App.3d 371, 377, for the principle that, "'In defending himself, however, a person may use only that force which is necessary in view of the nature of the attack . . . . [Citation.]'" (*Humphrey*, at p. 1094.) In addition, in *People v. Pinholster* (1992) 1 Cal.4th 865, a first

degree murder case (*id*. at p. 902), our Supreme Court stated, "any right of self-defense is limited to the use of such force as is reasonable under the circumstances." (*Id*. at p. 966.)

The challenged language in CALCRIM No. 505 comports with *Humphrey* and *Pinholster*, which we must follow. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) No instructional error occurred, and defendant suffered no violation of his rights under the federal Constitution.

## IV. Instruction on Self-Defense and Use of Deadly Force

### A. Defendant's Argument

Defendant contends that, if there was no error in reading CALCRIM No. 505, then the trial court erred in failing to instruct sua sponte that *imperfect* self-defense applied if defendant had a good faith but mistaken belief he was using no more force than necessary to defendant against Garnreiter's use of deadly force.

### B. Relevant Authority

The trial court has a sua sponte duty to instruct the jury on the general principles of law governing the case. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.) We review de novo the claim a court failed to properly instruct the jury on the applicable principles of law. (*Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)

### C. Analysis

According to defendant, if a person who *is* in imminent mortal danger and is authorized to use lethal force to defend himself is limited to using no more lethal force than is reasonably necessary, then a person who has an *actual but unreasonable* belief in the appropriateness of the amount of lethal force he is using must be found guilty of no more than manslaughter. He asserts that "CALCRIM No. 505 is in error for omitting this form of voluntary manslaughter." Since the record could have supported a finding that defendant used only the amount of deadly force he believed was reasonably necessary to defend himself, reversal is required.

Defendant cites no authority holding such an instruction is required. CALCRIM No. 505 is not an instruction on voluntary manslaughter, but rather an instruction that describes a complete defense—that of justifiable homicide. As the jury was instructed,

voluntary manslaughter is a lesser included offense of murder that may occur when a killing is committed because of a sudden quarrel or in the heat of passion (CALCRIM No. 570) or when the defendant killed a person in unreasonable self-defense. The concept that defendant argues is missing from the jury instructions is contained in the instruction for imperfect self-defense, CALCRIM No. 571. This instructs the jury that the defendant acted in imperfect self-defense if he actually believed that he was in danger of being killed *and* he actually believed that the immediate use of deadly force was necessary to defend against the danger *but* at least one of those beliefs was unreasonable. This instruction gives the jury the option defendant argues for, i.e., finding that the belief in the danger was reasonable, but the use of deadly force was unreasonable. Although defendant would parse this second factor even further by saying that the *degree* of deadly force was unreasonable, this further refinement adds nothing to the concept. "Deadly force" is not subject to quantification. CALCRIM No. 505 uses the phrase "no more force" than is necessary and not "no more deadly force than necessary," as defendant misquotes. If the type of force used was not likely to cause death (or serious bodily injury), it is simply nondeadly force. We believe defendant's overwrought analysis of the variables involved in manslaughter would require the jury members to engage in unnecessary mental gymnastics and likely confuse them in the process. Defendant himself mocks the notion of excessive versus reasonable *deadly* force in the opening and reply briefs. Moreover, given the jury's finding of premeditation, the alleged instructional "error" could not have prejudiced defendant.

## V. Nonstandard Instruction on Imperfect Self-Defense

### A. Defendant's Argument

Defendant contends the trial court's nonstandard instruction on voluntary manslaughter and imperfect self-defense was wrong in two of its three sentences. It led the jurors to believe defendant committed multiple acts that might have justified Garnreiter's attack; it failed to explain that if defendant's conduct was not life-threatening, then Garnreiter was not legally justified in resorting to lethal force; and it completely eliminated any need for the jury to consider what defendant's actual beliefs

31

were regarding self-defense. These errors prevented the jury from considering a key defense, violated due process, lightened the prosecution's burden of proof, and deprived defendant of his right to present a defense and to a jury trial.

### B. Proceedings Below

The trial court read the following instruction: "A defendant who, through his own wrongful conduct, such as initiating a physical assault, has created circumstances under which his adversary's attack is legally justified, may not invoke unreasonable self-defense. Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is legally justified in resorting to self-defense against the defendant. But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant sets in motion the chain of events that led the victim to attack the defendant."

### C. Analysis

The record reveals no objection from defense counsel regarding this instruction. As a general rule, a defendant's failure to object to an instruction given forfeits any objection thereto. (*People v. Hudson*, *supra*, 38 Cal.App.4th at pp. 1011-1012.) As we have in previous sections, we address the merits of defendant's complaint, since he alleges his substantial rights were affected.

The instruction the trial court read was taken directly from *People v. Vasquez* (2006) 136 Cal.App.4th 1176 (*Vasquez*), a case that cited the California Supreme Court case of *In re Christian S.* (1994) 7 Cal.4th 768 in laying out a principle, which, as stated in *Christian S.*, is well-established. A defendant may not invoke the doctrine of imperfect self-defense where she or he, "through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*Christian S.*, *supra*, 7 Cal.4th at p. 773, fn. 1.) It is also well established that "extracts from appellate opinions are deemed to be correct statements of the law." (*People v. Jones* (1971) 19 Cal.App.3d 437, 447.)

In *Vasquez*, defendant Vasquez invited his cousin Arechiga to join him and some friends in an alley. When Arechiga arrived, Vasquez, who was confined to a wheelchair, accused Arechiga of raping Vasquez's younger brother. Arechiga lunged at Vasquez and began to choke him. Vasquez pulled out a gun and shot Arechiga. (*Vasquez*, *supra*, 136 Cal.App.4th at pp. 1177-1178.) At Vasquez's trial on murder charges, the trial court declined to give the jury an instruction on imperfect self-defense. The court stated that Vasquez had "created the need to defend himself by luring Arechiga to the alley to confront him." (*Id*. at p. 1179.) The Court of Appeal reversed, setting forth the principle quoted *ante*, that a defendant may claim imperfect self-defense when the victim responds to the defendant's attack by using unlawful force himself. (*Id*. at pp. 1179-1180.) The court concluded that, although Vasquez may have been "up to no good," an instruction on imperfect self-defense was nevertheless required because it was Arechiga who "used unlawful force first." (*Id*. at p. 1180.)

Although the reasoning in *Vasquez* parallels that of defendant on appeal, he nevertheless finds two errors in the instruction. First, defendant complains that the use of "such as" in the first sentence conveyed to the jury that initiating a physical assault was only one form of wrongful conduct that could have justified Garnreiter attacking defendant, leaving it to the jury's discretion as to what other forms of wrongful conduct by defendant might have justified her attack. We see nothing in the record of this case that would provide a basis for the unguided speculation by the jury that defendant claims would have occurred. On the contrary, giving the example of a physical assault indicated to the jury that some petty act, such as insulting the victim, would not be considered the creation of a circumstance in which the victim was legally justified in attacking the defendant. The jury was fully aware of the facts of the case and the conduct of both defendant and Garnreiter. The instruction was actually helpful to defendant given the serious nature of Garnreiter's act of grabbing a knife, as described by defendant. There was nothing improper in having the jury determine whether any of the acts defendant testified to having committed were wrongful enough to create circumstances justifying Garnreiter's actions.

Defendant also argues that the second sentence is inaccurate where it tells the jury that imperfect self-defense does not apply if defendant's conduct created circumstances in which Garnreiter was legally justified in resorting to self-defense. Clearly, the sentence is accurate. Defendant complains that the sentence failed to explain that if defendant's conduct was not life-threatening, such as putting Garnreiter in a headlock without applying significant pressure, then Garnreiter was not legally justified in grabbing a knife and stabbing him. Defendant appears to be arguing again that he only used a little bit of lethal force. The question is not whether defendant's placing Garnreiter's head in a headlock was proven to be life-threatening, but whether defendant's conduct created circumstances in which Garnreiter was legally justified in resorting to self-defense against defendant. Clearly, the jury believed that being placed in a headlock is a circumstance in which a person would be justified in defending himself or herself.

Defendant also complains that with this sentence, the instruction completely eliminated any need for the jury to consider what defendant's actual beliefs were with regard to self-defense. As a result, the elements of imperfect self-defense contained in CALCRIM No. 571 were rendered insignificant. The instruction did not prohibit the jury from considering defendant's actual belief in the need for self-defense. The jury was instructed with CALCRIM No. 571 that it should consider whether defendant actually believed he was in imminent danger and actually believed the immediate use of deadly force was necessary. The jury was also instructed to consider the instructions all together. There was no prejudicial error.

## VI. Initial Aggressor and Deadly Force

### A. Defendant's Argument

Defendant contends the trial court erred in failing to instruct the jury sua sponte that if the initial aggressor uses nondeadly force, and his opponent responds with deadly force, the initial aggressor has a right to use deadly force to defend himself.

34

## B. Relevant Authority

A trial court is required to instruct a jury on the general principles of law which are relevant to the issues raised by the evidence in a given case. (*People v. Valdez* (2004) 32 Cal.4th 73, 115.) A pinpoint instruction explains the relationship between particular evidence and the elements of an offense, and is not required absent a defendant's request. (See *People v. Saille* (1991) 54 Cal.3d 1103, 1119-1120; *People v. Barton* (1995) 12 Cal.4th 186, 197.)

## C. Analysis

Relying on *People v. Quach* (2004) 116 Cal.App.4th 294, defendant argues that the trial court should have instructed the jury that "[w]here the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force. . . . If the victim uses such force, the aggressor's right of self-defense arises." (*Id.* at p. 301.) Stated otherwise, "'[W]hen a defendant engages in simple assault and his opponent responds with deadly force so suddenly that the person cannot withdraw, a defendant may immediately use deadly force in self-defense.'" (*Ibid.*)

The instruction regarding self-defense that defendant now contends should have been given sua sponte is essentially the same instruction he complains about in the previous section. Although that instruction pertained to defendant's right to *imperfect* self-defense, the concept defendant advocates is the same.

As a reminder, we repeat the instruction given: "A defendant who, through his own wrongful conduct, such as initiating a physical assault, has created circumstances under which his adversary's attack is legally justified, may not invoke unreasonable self-defense. Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is legally justified in resorting to self-defense against the defendant. *But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant sets in motion the chain of events that led the victim to attack the defendant.*" (Italics added.)

35

The instruction defendant claims should have been given (the second instruction) would read (according to the heading of this issue in defendant's opening brief): "An initial aggressor who uses nondeadly force and whose opponent responds with deadly force has a right to use deadly force to defend himself."

Both instructions label defendant as the initial aggressor, but of a nondeadly attack. In both instructions the adversary responds. In the second instruction, the victim has no right to use deadly force. In the first (given), the adversary must have a legally justified response and cannot engage in a use of force that is unlawful. In the second instruction, if the victim uses deadly or excessive force, the initial aggressor (the defendant) has a right of self-defense. In the first instruction (given), if the victim's use of force is unlawful, the defense of imperfect self-defense is available, even if the defendant was the initial aggressor.

Therefore, contrary to defendant's assertion, the omitted instruction was not "likely key to the jury's evaluation of the case, because it would have communicated what no other instruction did." It appears defendant is merely engaging in an exercise in semantics by proposing this additional instruction.

Although the given instruction dealt with imperfect self-defense and the "missing" instruction dealt with true self-defense, the concept that defendant's initial attack was benign, that Garnreiter responded inappropriately with deadly force, and that defendant was therefore justified in using deadly force on Garnreiter was duly presented to the jury, and it rejected that concept. The jury was clearly given an opportunity to evaluate defendant's initial attack, Garnreiter's response, and whether defendant reasonably or unreasonably believed he had to resort to deadly force. Furthermore, for the reasons explained in the prior issue, we disagree with defendant's claim that "[i]t is not possible to conclude beyond a reasonable doubt that the jury did not conclude that [defendant] had used non-lethal force up to the point where Garnreiter grabbed the knife and started to stab him," and that therefore reversal is required. Even defendant's own testimony revealed that Garnreiter told him to release her from the chokehold before she picked up the knife. Defendant did not do so, even when she grabbed his testicles. He responded

36

by squeezing her neck tighter. Defendant had the opportunity to cease struggling with Garnreiter before she grabbed the knife. Defendant was not prejudiced by the failure to instruct the jury with an additional instruction modeled on the language in *People v. Quach*, *supra*, 116 Cal.App.4th 294.

## VII. Ineffective Assistance of Counsel

### A. Defendant's Argument

Defendant contends the record is replete with evidence of profoundly deficient performance by trial counsel. Considered cumulatively, these deficiencies undermine the outcome and warrant a presumption of prejudice. He asserts that no court should have confidence in the outcome of a trial in which counsel's deficiencies were so pervasive and where a conviction of first degree murder was returned on evidence that was more compatible with a lesser verdict, and a new trial is called for.

### B. Relevant Authority

To establish ineffective assistance of counsel, defendant must first show that counsel's "acts or omissions were outside the wide range of professionally competent assistance." (*Strickland v. Washington* (1984) 466 U.S. 668, 690 (*Strickland*).) Second, defendant must show that the alleged deficiencies in counsel's performance were prejudicial to the defense, i.e., that there is a reasonable probability that but for counsel's unprofessional errors, the outcome of the case would have been different. (*Id*. at p. 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217-218.) A reasonable probability is a probability sufficient to undermine confidence in the conviction. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) It is not enough for defendant to show that errors had some conceivable effect on the outcome of the case. (*Ledesma*, at p. 217.)

We "'need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" (*In re Cox* (2003) 30 Cal.4th 974, 1019-1020; *Strickland*, *supra*, 466 U.S. at p. 697.)

## C. Analysis

During voir dire, a prospective juror, when answering the question as to whether she could be fair and impartial stated, "If you were to ask me this question yesterday I would absolutely say yes I could be fair and impartial. And I don't know if this is going to change my feelings or not, but after the attorneys both stood up and spoke this morning, I was thinking about this, I felt that the attorney representing Mr. Warren had a hard time articulating herself, and her thoughts were very unorganized, and I kind of zoned out, and stopped listening to her. And I felt like maybe that wouldn't be fair. So that's that. That is just my feeling. I just kind of felt like it was hard to understand her, and follow where she was going . . . her train of thought was very unorganized. And I just felt like that wasn't fair to Mr. Warren to have her represent him."

At the next recess, the trial court stated to defense counsel: "I had sort of the same observations as the juror. Your voir dire today was confusing to me. And I just want to—if anything is going on—are you okay? Taking any medication or anything? I'm serious." The court later added that it believed the juror was "right on." Counsel replied that she was tired, not on medication, and was taken aback when her voir dire questions did not draw responses from the jurors. She assured the court that she was ready.

Defendant argues that the juror's remarks and the court's comments in response are indications that defense counsel "was plainly not ready." He contends this lack of readiness was most on view during her examination of Dr. Perrotti, her expert witness. He cites a colloquy with the trial court wherein defense counsel stated she did not know exactly what Dr. Perrotti was going to testify to, and a comment from the court that it was concerned that counsel did not know why she was asking Dr. Perrotti certain questions. When counsel replied she did know but had not been able to articulate it, the court stated, "That's another problem. . . . What are you doing here if you cannot articulate things like that? I'm serious." Defendant asserts the record thereafter is "riddled with indications that counsel was unprepared for Dr. Perrotti's testimony" and gives several examples. Defendant quotes another criticism by the trial court in which it stated that defense counsel had confused Dr. Perrotti, asked questions that were not well thought out and was

"just repeating things." Counsel also failed to establish a foundation for defendant's jail medical records and for a screen shot of Facebook postings by Garnreiter that did not contain statements about which there had been testimony. These exhibits were excluded. Defendant asserts that "counsel was unfamiliar with the basic evidentiary requirement that a foundation needs to be laid in order for documents to be admissible."

Defendant complains that counsel also failed to object to CALCRIM No. 3472, which had no application to the case, and rendered deficient performance with respect to each of the instructional issues set out in his instant appeal. Counsel unreasonably failed to object to several aspects of the prosecutor's arguments as well. Defendant argues that trial counsel's own closing argument was deficient. She failed to tell the jury that provocation may occur over a short or long period of time and that provocation could reduce the offense from first degree murder to second degree murder. Counsel did not tell the jury that imperfect self-defense would apply even if they discarded defendant's strongly impeached PTSD claim, since it could find imperfect self-defense if it concluded that Garnreiter had responded with deadly force to defendant's nondeadly force. Counsel failed to sufficiently argue the lack of evidence of premeditation and deliberation.

Defendant argues that the standard of prejudice for ineffective assistance has been met. Moreover, he contends, this is a case where the circumstances are so likely to prejudice the accused that the cost of litigating their effect is unjustified, and prejudice is presumed, citing *United States v. Cronic* (1984) 466 U.S. 648 (*Cronic*).

We disagree with defendant that he need not show he was prejudiced by the alleged ineffective assistance he received. In *Cronic*, the United States Supreme Court held that prejudice need not be shown where the trial lost "its character as a confrontation between adversaries" (*Cronic*, *supra*, 466 U.S. at pp. 656-657, 659), i.e., where there was a "complete denial of counsel" at a critical stage, where "counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing," or where even a competent attorney would have been unable to provide effective assistance under the circumstances. (*Id*. at pp. 659-660.)

39

In *Bell v. Cone* (2002) 535 U.S. 685, the Supreme Court explained that its holding in *Cronic* was extremely narrow: "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." (*Bell v. Cone*, at pp. 696-697.) The California Supreme Court has also deemed the *Cronic* exception to be quite limited: "Defendants have been relieved of the obligation to show prejudice only where counsel was either totally absent or was prevented from assisting the defendant at a critical stage." (*In re Visciotti* (1996) 14 Cal.4th 325, 353.)

Although defendant is able to point out numerous areas in which he believed counsel's performance was deficient, it is clear from the record that his attorney did not completely fail to test the prosecution case. Faced with her client's admitted act of killing the victim, defense counsel clearly had a strategy of showing he was guilty only of manslaughter. She did not fail to cross-examine witnesses or present relevant witnesses or argument. Even if we accepted in full defendant's characterization of counsel's actions as failings, the record of the proceedings below does not show "a total breakdown of the adversarial process within the meaning of []*Cronic, supra*, 466 U.S. 648." (*In re Visciotti, supra*, 14 Cal.4th at p. 352.) In *Florida v. Nixon* (2004) 543 U.S. 175, the Supreme Court reiterated that the exception to the general rule requiring a showing of a prejudicially deficient performance under *Strickland* is extremely narrow. It stated: "We illustrated just how infrequently the 'surrounding circumstances [will] justify a presumption of ineffectiveness' in *Cronic* itself. In that case, we reversed a Court of Appeals ruling that ranked as prejudicially inadequate the performance of an inexperienced, underprepared attorney in a complex mail fraud trial. [Citation.]" (*Florida v. Nixon, supra*, 543 U.S. at p. 190.)

Defendant's claim of constitutionally ineffective counsel is thus subject to the traditional test, in which "defendant has the burden of proving that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability that, but for counsel's

unprofessional errors, the result would have been different. [Citations.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 519–520.)

Under this test, even assuming trial counsel failed in all of the ways defendant names, defendant has not established prejudice, and his contention must therefore be rejected. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." (*Strickland*, *supra*, 466 U.S. at p. 696.)

Given the strong evidence of defendant's guilt of first degree murder, it is unclear what, if anything, counsel could have done (or not done) to change the outcome of the trial. Even if we assume that counsel's speech or manner was annoying to some of the jurors, the jury is presumed to follow the court's instructions. (*People v. Sanchez* (2001) 26 Cal.4th 834, 852.) The record is devoid of any evidence to suggest that the jury disregarded the instruction not to consider the attorneys' statements as evidence.

As for the criticism of counsel's voir dire, it appears that counsel's rhetorical device (analogizing the elements of a crime to ingredients of a recipe) fell flat. The jurors apparently did not want to participate in her analogy, but this does not equate to ineffective assistance. Counsel answered the trial court's concerns with her explanation that the failure of the jurors to answer her questions led her to become flustered. This was a reasonable explanation, and on the cold record, we cannot say whether the trial court was overly harsh in agreeing so thoroughly with the complaining juror and in making some of the other remarks defendant notes in his brief.

With respect to counsel's examination of Dr. Perrotti, although counsel may have stumbled when challenged by the prosecutor and used inartful phrases in answering the trial court's criticisms, her examination of Dr. Perrotti was not completely ineffective. The California Supreme Court has stated that in egregious cases, "[e]ven where defense counsel may have '"elicit[ed] evidence more damaging to [defendant] than the prosecutor was able to accomplish"' . . . we have been 'reluctant to second-guess counsel' [citation]

where a tactical choice of questions led to the damaging testimony." (*People v. Williams* (1997) 16 Cal.4th 153, 217.)  Once Dr. Perrotti was on the stand, counsel could not exercise complete control over his responses, regardless of her degree of preparation.  In any event, it appears that Dr. Perrotti gave favorable testimony on defendant's theory of PTSD, and defendant does not show how a different direct examination by defense counsel would have revealed stronger evidence of his condition so as to eliminate the possibility of a verdict of murder.  Hence, defendant was not prejudiced.  Likewise, defendant was not prejudiced by counsel's failure to obtain admittance of the two exhibits.  He does not explain how the Facebook screen shot or defendant's medical records from jail would have changed the outcome.  Dr. Perrotti gave sufficient evidence of defendant suffering from PTSD for the jury to evaluate this condition in regard to imperfect self-defense, and the Facebook screen shot appeared to be cumulative of McDaniel's testimony to the degree that it was relevant.

Defendant also points out as evidence of ill preparation that defense counsel asked Detective Peyton whether defendant slurred his words when he was interviewed at the hospital.  Detective Peyton's response was, "No.  You have a copy of the recording." The second part of the detective's answer was unresponsive.  It was also curt, as were many of his responses, and was not evidence of counsel's poor performance.  Regardless of whether defense counsel listened to the recording, she was entitled to attempt to elicit testimony regarding defendant's degree of apparent lucidity from the detective.

Defendant argues that counsel prejudicially failed to object to the reading of CALCRIM No. 3472, which told the jury that a person has no right to self-defense if he provoked a quarrel with the intent to create an excuse to use force.  Defendant asserts that this instruction had no application to his case.  If this was indeed true, the jury was instructed that some of the instructions might not apply to defendant's case, and that it should follow only the instructions that applied to the facts as the jury found them to be. (CALCRIM NO. 200.)  Defendant suffered no prejudice from the reading of this instruction.  (See *People v. Cross* (2008) 45 Cal.4th 58, 67 [inapplicable instructions generally constitute mere technical errors and are not grounds for reversal].)  We have

42

addressed defendant's other claims regarding the jury instructions elsewhere in this opinion.

With respect to any failure to object to the prosecutor's closing argument, we note that a trial counsel's failure to object during summation seldom establishes ineffective assistance of counsel. (*People v. Collins* (2010) 49 Cal.4th 175, 233; *People v. Avena* (1996) 13 Cal.4th 394, 421; *People v. Ghent* (1987) 43 Cal.3d 739, 772-773.) Defense counsel may have concluded the prosecutor's misstatement in opening argument was brief and adequately addressed in the jury instructions. The record does not affirmatively disclose that defense counsel had no rational tactical purpose for failing to object to the prosecutor's comments concerning provocation.

We also find no prejudice in counsel's allegedly deficient performance in her closing argument. "The mere circumstance that a different, or better, argument could have been made is not a sufficient basis for finding deficient performance by defense counsel. [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 748.) "Even if some of the arguments [not made] would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them. . . . [J]udicious selection of arguments for summation is a core exercise of defense counsel's discretion." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 7-8.)

We have concluded there was strong evidence of defendant's guilt of first degree murder. The jury was properly instructed on first degree murder, second degree murder, and manslaughter. Given the circumstances surrounding the crime in this case, it was not any supposed weakness in defense counsel's argument that caused the jury to find defendant deliberated and premeditated the stabbing of Garnreiter. All of the evidence that defendant cites as being omitted by his trial counsel at argument was heard by the jury, and it is not reasonable to suppose that had counsel mentioned this evidence again during her closing argument, defendant would have received a more favorable verdict.

**VIII. Cumulative Error**

Defendant contends that the accumulation of errors in this case was surely prejudicial under federal constitutional law. Defendant again refers to "numerous

43

misleading instructions and arguments regarding provocation, self-defense, . . . imperfect self-defense, and the blatantly substandard performance of . . . defense counsel" and argues that defendant's trial was fundamentally unfair in violation of the due process clause of the federal Constitution. He maintains that the same is true if the errors are matters of state law only and the inquiry is whether it is reasonably probable defendant would have obtained a different outcome in the absence of the errors.

We disagree, and, as we have indicated in this opinion, we do not believe any of the alleged errors, singly or cumulatively, deprived defendant of a fair trial of his guilt. As the California Supreme Court has stated, "A defendant is entitled to a fair trial, not a perfect one." (*People v. Mincey* (1992) 2 Cal.4th 408, 454.) There has been no showing of cumulative prejudicial error of a degree sufficient to permit reversal

## IX. Credit Days

Defendant argues, and respondent agrees, that defendant is entitled to 1,077 days of actual custody credit instead of the 1,010 days he was awarded by the trial court. Defendant was arrested on the day of the murder, January 8, 2011, and he was sentenced on December 19, 2013. There is no evidence he was released at any time between his arrest and his sentencing.

A defendant is entitled to credit for a day of custody for each day he spends in custody. This includes partial days, such as the date of his arrest and the date of his sentencing. (*People v. Morgain* (2009) 177 Cal.App.4th 454, 469.) The abstract of judgment must be modified to reflect the correct number of days of presentence credit, which is 1,077 days.

## DISPOSITION

The superior court is directed to correct the number of credit days on defendant's abstract of judgment and to forward a corrected copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


BOREN, P.J.

We concur:


ASHMANN-GERST, J.


HOFFSTADT, J.